## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 13-cv-2344-WJM-MJW

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of New Frontier
Bank, Greeley, Colorado,

     Plaintiff,

v.

KANSAS BANKERS SURETY COMPANY,

     Defendant.

---

## ORDER GRANTING SUMMARY JUDGMENT

---

     The Federal Deposit Insurance Corporation ("FDIC"), is the receiver for a failed

bank, New Frontier Bank of Greeley, Colorado ("Bank").  (ECF No. 1 ¶¶ 5–6.)  The

FDIC sues Kansas Bankers Surety Company ("KBS") for KBS's failure to honor the

Bank's (and subsequently, the FDIC's) claim under the Bank's Financial Institution

Crime Bond ("Bond").  (*See generally* ECF No. 1.)

     KBS now moves for summary judgment.  (ECF Nos. 80, 81.)  For the reasons

explained below, the Court concludes that the Bank's opportunity to submit a proof of

loss for its Bond claim expired when the FDIC took over.  Because the Bank did not

submit a complete proof of loss by that time, the FDIC's claim under the Bond fails.

Summary judgment is therefore granted in KBS's favor.[1]

---

[1] Both parties filed their summary judgment papers, including all exhibits, entirely under
seal (specifically, Restricted Access, Level 1).  *See* D.C.COLO.LCivR 7.2.  This includes
documents that have already been publicly filed elsewhere.  For example, the Bond is a publicly
filed exhibit to the FDIC's complaint (ECF No. 1-1) but is then filed under seal, with a
"confidential" designation, in KBS's summary judgment papers (ECF No. 80-1).  In addition, the

# I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

When, as here, "the moving party does not bear the ultimate burden of

---

Adversary Proceeding complaint against the Bank, discussed further below, is a publicly filed document in the Adversary Proceeding (*see Estates of Johnson Dairy, LLC and John D. Johnson v. Greg Bell et al.*, No. 09-ap-1114-SBB, ECF No. 1 (Bankr. D. Colo., filed Feb. 25, 2009)) but is likewise filed under seal, with a "confidential" designation, in KBS's summary judgment papers (ECF No. 80-16).  It appears that a fair number of other exhibits, and perhaps all of the arguments in the parties' briefs, likely do not qualify for Restricted Access.  In any event, to the extent a brief or exhibit is quoted or summarized below, the Court has determined that the portion quoted or summarized does not meet the standards for Restricted Access set forth in D.C.COLO.LCivR 7.2(c)(2)–(4).

persuasion at trial, it may satisfy its burden on a motion for summary judgment by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted). If the movant meets this burden, the burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (internal quotation marks omitted).

## II. FACTS

The factual record in this case has been developed in significant detail. The following summary suffices for purposes of this order, and is undisputed unless otherwise noted.

### A.     Greg Bell, Johnson Dairy, and the Cow Lease Arrangements

This lawsuit centers around the actions of non-party Greg Bell, who worked as a loan officer for the Bank from 2001 to 2009. (Movant's Statement of Material Facts ("Defendant's Facts") (ECF No. 80 at 4–24) ¶ 4.) Bell had an extensive relationship with one of the Bank's largest borrowers, Johnson Dairy. (Statement of Disputed Additional Facts ("Plaintiff's Facts") (ECF No. 86 at 17–40) ¶ 161.) Johnson Dairy was aggressively expanding its business through Bank financing, but reached the Bank's legal lending limit by the summer of 2003. (*Id.* ¶ 162.) Johnson Dairy nonetheless needed more money, in particular to buy cows to fill a newly constructed milk barn. (Defendant's Facts ¶¶ 11–12.)

3

Bell and Johnson Dairy then agreed on a plan that was either a legal way of continuing to help Johnson Dairy grow its business (according to KBS) or an illegal method of circumventing the Bank's lending limits (according to the FDIC). (Defendant's Facts ¶ 14; Plaintiff's Facts ¶¶ 162–64.)  Under this plan, over the next several years, Bell arranged for the Bank to loan money to Bell's friends, girlfriend, and parents.  (Defendant's Facts ¶¶ 61–62, 65–66, 72–104.)  These individuals (sometimes acting together in partnerships) would use the loan proceeds to buy cows, and would then lease those cows to Johnson Dairy for more than the carrying cost of the loans. (*Id*.)  Thus, although the Bank had not loaned new money to Johnson Dairy, the Bank's fortunes still depended on Johnson Dairy's financial performance, *i.e.*, ability to make the lease payments.

Johnson Dairy continued to expand its operations, and in 2007, completed the largest dairy barn in the world.  (*Id*. ¶ 22.)  At that point, nearly 9,000 of Johnson Dairy's 10,000 cows were leased from Bell's friends and family.  (*Id.* ¶ 23.)  In September 2008, however, milk prices fell by more than 50% and feed prices rose "dramatically."  (*Id.* ¶ 41.)  Johnson Dairy could not afford to milk its cows and filed for bankruptcy protection on January 9, 2009.  (*Id.* ¶¶ 43–44.)

The same day, Johnson Dairy's attorney sent a letter to the Bank, accusing the Bank of a "course of wrongful and improper conduct," including "requiring . . . cattle-lease agreements as a prerequisite to financing."  (ECF No. 80-39 at 3–4.)  "[B]e assured," the letter went on, "that in any litigation between the parties, evidence of the Bank's misconduct will be discovered."  (*Id.* at 4.)

4

B.      **The Bank's Initial Communications With KBS**

The Bank is party to the Bond, a "financial institution crime bond" underwritten by KBS.  (ECF No. 1-1 at 2.)  "Insuring Agreement A" of the Bond covers "[l]oss [to the Bank] resulting directly from dishonest or fraudulent acts committed by an Employee with the Active and Conscious Purpose to cause the [Bank] to sustain such loss." (*Id.* at 2.)  Normally, the Bond requires the Bank to give KBS notice of a loss "[a]t the earliest practicable moment, not to exceed 30 days, after discovery of loss." (*Id.* at 13.) Then, "[w]ithin 6 months after such discovery," the Bank must "furnish to [KBS] proof of loss, duly sworn to, with full particulars and complete documentation." (*Id.*)

Perhaps cognizant of these deadlines in light of the threatening letter from Johnson Dairy's attorney, the Bank's attorney faxed a letter to KBS on February 4, 2009, stating that "we are notifying you of a potential claim.  Enclosed is a copy of a letter dated January 9, 2009 from [Johnson Dairy's attorney]." (ECF No. 80-39.)  KBS responded by letter dated that same day. (ECF No. 80-40.)  KBS's response summarized its understanding of the Bank's letter and the accusations in Johnson Dairy's letter. (*Id.* at 1.)  KBS also stated, "Please let us know promptly if the bank has any reason to believe that any of the allegations in the letter are accurate or if the bank, or its officers, directors, or employees have any reason to believe that Wrongful Acts or Wrongful Lending Acts have been committed." (*Id.*)

C.      **The Adversary Proceeding**

On February 25, 2009, Johnson Dairy filed an Adversary Proceeding against Bell, the Bank, and various others. (ECF No. 80-16.)  As against the Bank, Johnson

Dairy essentially alleged that the Bank's loans and Bell's cow lease arrangements were coercive and meant to enrich the Bank unduly at Johnson Dairy's expense, in violation of the Bank's alleged fiduciary duty. (*Id.* ¶¶ 77–79.) Johnson Dairy also asserted various other forms of illegality connected to other transactions not at issue here. (*See, e.g.*, *id.* ¶¶ 73, 121.) The next day, the Bank's general counsel, Robert Wiest, forwarded a copy of the Adversary Proceeding complaint to KBS, accompanied by a three-line letter generically requesting coverage under the Bond. (ECF No. 80-41.)

**D.   KBS's Choice Not to Defend the Bank**

On March 24, 2009, Wiest once again send a copy of the Adversary Proceeding complaint to KBS, this time accompanied by a four-paragraph letter. (ECF No. 80-43.) As relevant here, Wiest's letter states as follows:

> Claimants [Johnson Dairy and its principal] have numerous unpaid loans from the Bank for their dairy business. Their Complaint alleges that Bell, acting in concert with other defendants, committed various dishonest and fraudulent acts that caused Claimants to become insolvent, forcing them to seek bankruptcy protection. They further allege that Bell and other individuals who allegedly committed such unlawful acts received improper financial benefits, all at the expense of Claimants. The relief sought by Claimants includes full discharge of all indebtedness to the Bank and an unspecified amount of damages. A copy of the Complaint is enclosed.

(*Id.* at 1.) Wiest's letter to KBS continued,

> The Bank does not admit any wrongdoing alleged in the Complaint. Nonetheless, if Claimants were to prevail in their claims, the discharged loans and other losses sustained by the Bank would constitute Collectible losses under Insuring Agreement A of the [Bond]. Accordingly, the Bank requests that [KBS] provide a defense in accordance with General Agreement (F).

(*Id.*)

The Bond's General Agreement F, invoked by Wiest, provides that the Bank

> shall notify [KBS] at the earliest practicable moment, not to exceed 30 days after notice thereof, of any legal proceeding brought to determine the [Bank's] liability for any loss, claim or damage, which, if established, would constitute a collectible loss under this bond. . . .
>
> [KBS], at its sole option, may elect to conduct the defense of such legal proceeding, in whole or in part. . . .

(ECF No. 1-1 at 7.)  If KBS "does not elect to defend any causes of action," then two consequences follow.  First,

> neither a judgment against the [Bank], nor a settlement of any legal proceeding by the [Bank], shall determine the existence, extent or amount of coverage under this bond for loss sustained by the [Bank], and [KBS] shall not be liable for any attorneys' fees, costs and expenses incurred by the [Bank].

(*Id.*)  Second, the Bank's normal deadline to submit a complete proof of loss, rather than being due six months from discovery, is extended to six months from a judgment in, or settlement of, the litigation in question.  (*Id.*)

KBS responded to Wiest's letter by a letter dated March 30, 2009.  (ECF No. 80-44.)  KBS stated that it did "not necessarily agree with" Wiest's claim that losses in the Adversary Proceeding would be covered by the Bond, "but only after the litigation is concluded will we be able to evaluate a possible claim under the [Bond] stemming from the litigation."  (*Id.* at 1.)  KBS then announced that it had "not elected to defend the bank under [General Agreement F]," and the Bank therefore "should file proof of any covered loss, with full particulars and complete documentation within six months after the entry of judgment or the occurrence of a settlement."  (*Id.* at 2.)

7

**E.     The Bank's Submission of Additional Detail**

On April 1, 2009, Wiest sent another letter to KBS.  (ECF No. 80-45.)  This letter,

three pages long and notarized, mostly comprised a point-by-point summary of the

Adversary Proceeding complaint.  (See *id.*)  Toward the end of the letter, however,

Wiest announced that he was

> submitting Bank records containing information that may
> have a bearing on various allegations made in the
> Complaint.  They are produced in two boxes that accompany
> this proof of loss.  Claimants' credit file at the Bank
> constitutes the majority of the documents and, among other
> things, includes credit application and approval files,
> promissory notes, deeds of trust, corporate formation
> certificates and filings, financial statements and tax returns,
> UCC financing statement files, inventories of cattle and feed,
> field inspection reports, appraisals, insurance policies,
> participation agreements, and the like.  In addition, we are
> producing credit files for Bank loans to [the individuals who
> leased cows to Johnson Dairy] to the extent bearing on any
> transactions they may have had with Claimants.  The
> documents are similar to those identified above for the
> Claimants['] credit files and include leases and other
> agreements between Claimants and these other parties.
>
> I certify that the documents being submitted with this proof
> of loss are genuine copies of materials found in the books
> and records of [the] Bank.  I otherwise lack first-hand
> knowledge concerning the contents of the documents being
> submitted and the allegations made by Claimants in their
> Complaint.

(*Id.* at 3.)

At his deposition in this case, Wiest stated "that at the time he signed the

[foregoing] letter, the Bank had not suffered a loss and [he] had no idea what the nature

of the loss would be, if there was one.  [He] did not know if Bell had caused any loss to

the bank[.]"  (Defendant's Facts ¶ 113.)  Nor could Wiest, at that time, "verify the truth

or falsity of the allegations in the Adversary Complaint." (*Id.* ¶ 114.)

By letter dated April 2, 2009, KBS responded to Wiest's second letter. (ECF No. 80-47.) KBS denied that the letter constituted an adequate proof of loss: "Your letter restates the allegations made in a lawsuit with a statement that the bank lacks any first hand knowledge of the allegations made in the complaint. This is not proof of any loss covered by the bond with full particulars and complete documentation." (*Id.* at 1.) KBS agreed, however, that some of the allegations against Bell were "certainly suspicious," and encouraged the Bank to investigate Bell's role further. (*Id.*)

KBS also "point[ed] out that it is imperative that the bank file proof of loss prior to any taking over of the bank by a receiver or other liquidator or state or federal officials." (*Id.* at 3.) KBS then quoted the Bond's Condition 14, which reads in relevant part as follows:

> This bond terminates as an entirety * * * immediately upon
> the taking over of the Insured by a receiver or other
> liquidator or by State or Federal officials . . . .
>
> * * *
>
> After termination or cancellation, no . . . Federal official . . .
> acting in the capacity of . . . receiver . . . shall have or
> exercise any right to make any claim against [KBS], unless a
> Proof of Loss, duly sworn to, with full particulars and
> complete documentation has been received by [KBS] prior
> to the termination or cancellation of this bond.

(ECF No. 1-1 at 15.) In light of the Bank's increasingly precarious position, KBS concluded by encouraging the Bank to meet the proof-of-loss requirement before any FDIC takeover. (ECF No. 80-47 at 4.)

Also on April 2, 2009, the Bank sent a third letter to KBS, this one signed and notarized by a different Bank employee, Wanda Anderson.  (ECF No. 80-48.)  This letter claimed to enclose the transcript of a recent deposition of Bell and summarized the possibility—apparently discovered at the deposition—that Bell may have gained an improper financial benefit from the cow leasing arrangements because his girlfriend was part of a business partnership to which some of the lease profits flowed.  (*Id.* at 1–2.)

KBS responded by letter dated the next day, noting that Anderson had not, in fact, enclosed the deposition transcript, and that the letter otherwise did not meet the standard of a proof of loss "with full particulars and complete documentation."  (ECF No. 80-49 at 1.)  KBS again quoted Condition 14 (requiring proof of loss before any takeover by a receiver) and encouraged the Bank to be aware of that requirement.  (*Id.* at 3–4.)

KBS sent another letter to the Bank on April 6, 2009.  (ECF No. 80-50.)  This letter appears to be an additional response to Wiest's April 1 letter.  In it, KBS claimed that "the bank does not prove, or even allege, that Mr. Bell committed dishonest or fraudulent acts with the active and conscious purpose to cause the bank a loss.  In fact, the allegations in the lawsuit allege the bank took actions which harmed [Johnson Dairy] for the attempted benefit of the bank."  (*Id.* at 1.)

## F.     The FDIC's Takeover and Eventual Settlement

On April 10, 2009, the Colorado State Banking Commissioner closed the Bank and appointed the FDIC as receiver.  (Defendant's Facts ¶ 1.)  The FDIC eventually settled the Adversary Proceeding under terms the Bankruptcy Court declared

confidential.  (*See* ECF No. 86-20.)  For present purposes, however, it suffices to note

that the settlement—like most settlements—was a compromise, meaning the FDIC

could not recover the entire amount loaned to Johnson Dairy.  (Plaintiff's Facts ¶ 190.)

The FDIC then turned around and demanded from KBS the difference between the

settlement and the amount loaned as its "loss" under the Bond.  (Defendant's Facts

¶¶ 128–30.)  KBS refused the FDIC's demand, stating that it had not received proof of

loss before the FDIC's appointment.  (*Id.* ¶ 129.)  This lawsuit followed.[2]

## III.  ANALYSIS

### A.    Applicable Law

Federal law governs suits brought by the FDIC, *see* 12 U.S.C. § 1819, but there

is no federal statute regarding the proper interpretation of surety bonds.  Thus,

> it is a matter of judicial policy as to whether a court should
> apply state substantive law or fashion a federal common law
> rule.  State law is presumed adequate unless it conflicts with
> federal statutory provisions or there is a significant conflict
> between some federal policy or interest and the use of state
> law.

*FDIC v. Oldenburg*, 34 F.3d 1529, 1538 (10th Cir. 1994) (internal quotation marks,

citation, and footnote omitted).

Based on these principles, KBS argues that the Bond should be interpreted

under Colorado law.  (ECF No. 80 at 25.)  The FDIC nowhere challenges this argument.

Accordingly, the Court will apply Colorado law.

---

[2] In late 2012, Bell was charged with various counts of bank fraud and money laundering based on his actions at the Bank.  (*See United States v. Gregory William Bell*, No. 12-cr-508-LTB (D. Colo., filed Dec. 5, 2012).)  He pleaded guilty and was sentenced to thirty months in prison.  (*See id.*, ECF No. 28.)

### B.   Fidelity Bonds Under Colorado Law

"The interpretation of an insurance policy is a legal question."  *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002).  The Bond is a special form of insurance known as a fidelity bond, *i.e.*, "a contract 'whereby one for consideration agrees to indemnify the insured against [a] loss arising from the want of integrity, fidelity, or honesty of employees or other persons holding positions of trust.'"  *Abady v. Certain Underwriters at Lloyd's London Subscribing to Mortg. Bankers Bond-No. MBB-06-0009*, 317 P.3d 1248, 1251–52 (Colo. App. 2012) (quoting 11 *Couch on Insurance* § 160:7 (3d ed. 2005)) (alteration in original).  "Though denominated a bond, fidelity contracts are in legal effect analogous to policies of insurance and, therefore, the rules applicable in construing insurance contracts apply."  *Id.* at 1252.

KBS argues, however, that at least one traditional aspect of Colorado law regarding insurance contracts does not apply.  Specifically, in Colorado, ambiguous provisions (those susceptible to more than one reasonable interpretation) are usually construed against the drafter and in favor of coverage.  *See, e.g.*, *Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010).  But, according to KBS, "'[s]tandard fidelity bonds are drafted by sophisticated parties (representatives of the banking and insurance industries); therefore, the traditional rule of construing any ambiguity in favor of coverage does not apply.'"  (ECF No. 80 at 25 (quoting *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 568 (7th Cir. 2009)) (alteration in original).)

The *First State* case was applying Illinois law, *see First State*, 555 F.3d at 567–68, but Colorado law appears to endorse the same principle.  *See Hoang v.*

12

*Assurance Co. of Am.*, 149 P.3d 798, 802 (Colo. 2007) ("When the insurance policy was offered on a take it or leave it basis, *rather than being fully negotiated by the parties*, we have a heightened responsibility in reviewing its terms. *In such circumstances*, we construe an ambiguity in favor of coverage." (emphasis added; citation omitted)).  The FDIC responds by invoking *United Bank & Trust Co. v. Kansas Bankers Surety Co.*, 901 F.2d 1520 (10th Cir. 1990), where the Tenth Circuit stated that "[c]ourts interpreting fidelity bonds follow the liberal rules applicable to insurance contracts, not the strict rules of suretyship." *Id.* at 1522.  (*See also* ECF No. 86 at 10 n.1.)  Notably, however, *United Bank* did not elaborate on this general statement, and in particular, nowhere announced a rule that ambiguity in fidelity bonds should be construed in favor of coverage.  Moreover, although *United Bank* involved what could have been characterized as an ambiguity in the meaning of the bond at issue, *United Bank* nonetheless ruled against coverage.  *See* 901 F.2d at 1522–25.

The FDIC also points to *Bailey v. Lincoln General Insurance Co.*, 255 P.3d 1039, 1051 (Colo. 2011): "If . . . the question of whether certain coverage exists is susceptible to more than one reasonable interpretation, then the coverage provisions are ambiguous, to be construed against the insurer as the drafter of the policy" (internal quotation marks and citations omitted).  (*See also* ECF No. 86 at 10 n.1.)  But *Bailey* only states a general rule, and does so in the context of a consumer-level insurance policy that the Colorado Supreme Court viewed as subject to the scrutiny generally given to insurance policies that "are not the result of bargaining and are . . . imposed on a take-it-or-leave-it basis." *Id.* at 1049.  The FDIC nowhere offers any explanation why

13

such scrutiny continues to apply to a heavily negotiated agreement between sophisticated parties.  Given the absence of meaningful argument from the FDIC on this question, the Court agrees with KBS that it need not construe any ambiguity in favor of coverage.

## C.      FDIC's Ability to Enforce the Bond

KBS's primary argument for summary judgment is based on the Bond's Condition 14.  As noted above, Condition 14 states that the Bond "terminates as an entirety * * * immediately upon the taking over of the [Bank] by a receiver or other liquidator or by State or Federal officials" and that no government receiver "shall have or exercise any right to make any claim against [KBS], unless a Proof of Loss, duly sworn to, with full particulars and complete documentation has been received by [KBS] prior to the termination or cancellation of this bond."  (ECF No. 1-1 at 15.)  KBS asserts that the Bank never met this requirement before the FDIC's takeover.  (ECF No. 80 at 25–29.)

In response, the FDIC does not claim that any of the materials the Bank submitted prior to the FDIC's takeover constituted a "Proof of Loss, duly sworn to, with full particulars and complete documentation."  Rather, the FDIC argues that this proof-of-loss requirement was excused for at least three reasons: (1) the Bank had timely discovered and given notice of a potential claim, which is all that was really required; (2) General Agreement F overrides Condition 14, thus giving the FDIC six months from the conclusion of the Adversary Proceeding to provide a complete proof of loss; and (3) Condition 14 is otherwise against public policy and should not be enforced.  (ECF No. 86 at 41–48.)  The Court will address each argument in turn.

14

1.    Discovery and Notice

Relying on testimony from an expert on fidelity bonds, the FDIC begins by

arguing that

> [e]very bond claim involves (1) "discovery" of a claim or
> potential claim, (2) notice thereof, and, finally (3) proof of
> loss, which is typically due six months after discovery but is
> sometimes (including here) deferred pending resolution of
> underlying litigation.  As both of the bond experts in this case
> agree, a bank "makes" a claim by completing the first two
> steps of the claims process, discovering fraud or alleged
> fraud, and providing notice thereof to the bond company.
> Proof of the claim, including the particulars, comes later.

(*Id.* at 42 (citations omitted).)[3]  The FDIC therefore argues that the Bank had already

"made a claim" under Condition 14 when the FDIC took over.

The relevance of this argument is unclear.  The FDIC appears to be saying that a

bank which makes a claim (*i.e.*, discovers and provides notice of a potential loss) before

FDIC takeover thereby reserves its right to submit a complete proof of loss at a later

time.  Whether or not this is generally true for fidelity bonds, it is simply not true for the

Bond at issue here.  It requires more than discovery and notice.  It requires "Proof of

Loss, duly sworn to, with full particulars and complete documentation" to be "received

by [KBS] prior to [FDIC takeover]."  (ECF No. 1-1 at 15.)

Thus, the FDIC's arguments regarding the proper interpretation of "make any

claim" are beside the point.  They do not excuse compliance with Condition 14's

proof-of-loss requirement.

---

[3] KBS objects to the admissibility and characterization of the expert testimony on which
the FDIC relies.  (*See* ECF No. 91 at 11–12, ¶¶ 208, 211, 214.)  Because the Court generally
rejects the FDIC's argument, it need not address KBS's evidentiary objections.

2.     Condition 14 vs. General Agreement F

The FDIC next points to the fact that the Bank had demanded a defense under

the Bond's General Agreement F but KBS declined, thus triggering an extension of the

normal proof-of-loss deadline to six months after the end of litigation.  *See* Section II.D,

*supra*.  The FDIC argues that General Agreement F's extension trumps Condition 14's

strict deadline.  (ECF No. 86 at 45–47.)  KBS argues precisely the opposite.  (ECF No.

91 at 18–19.)  Both parties rely on the "specific over general" canon of contractual

interpretation,[4] but of course the FDIC claims that General Agreement F is the more

specific, while KBS claims the same for Condition 14.  (ECF No. 86 at 46; ECF No. 91

at 18.)

The Bond at issue here is based on a commonly used template known as

"Standard Form No. 24."  (ECF No. 80 at 24.)  The Seventh Circuit has recently noted

that "Standard Form No. 24 . . . has a well-chronicled history.  Over the last century,

nearly every term in the Form 24 bond has been developed in reaction to court

interpretations of prior versions of the bond.  As a result, certain terms within the bond

carry nuanced and well-established meanings."  *Universal Mortg. Corp. v.*

*Wurttembergische Versicherung AG*, 651 F.3d 759, 761 (7th Cir. 2011).

Despite this well-chronicled history, neither the parties nor the Court could find

any authority regarding the interplay of or relationship between General Agreement F

and Condition 14.  Nor does either provision, on its face, obviously indicate that it is

---

[4] *See, e.g., E-470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo. App. 2001) ("it is a basic principle of contract interpretation that a more specific provision controls the effect of general provisions"), *aff'd*, 49 P.3d 1151 (Colo. 2002).

16

more specific than the other.  Thus, there is not much to work with when resolving this potential conflict.  For four reasons, however, the Court ultimately concludes that Condition 14 controls over General Agreement F.

First, and most obviously, General Agreement F is part of the Bond's "General Agreements," whereas Condition 14 is part of the Bond's "Conditions and Limitations." (ECF No. 1-1 at 6–15.)[5]  *Cf. 2 Couch on Insurance* § 22:2 (3d ed., Nov. 2014 update) ("a specific provision limiting coverage controls a prior general coverage provision").

Second, in a previous lawsuit between the FDIC and KBS, the Tenth Circuit noted that Condition 14 trumps Condition 5's usual requirement that proof of loss be submitted within six months of discovery.  *FDIC v. Kan. Bankers Sur. Co.*, 963 F.2d 289, 291 n.2 (10th Cir. 1992) ("The ordinary notice provision is found in [Condition] 5 which allows the Insured thirty days to give notice and six months to furnish a proof of loss.  As the bonds terminated upon the appointment of a receiver, [Condition 14] and not [Condition] 5 is the applicable notice provision in this case.").  Although this decision does not address General Agreement F, it nonetheless suggests that Condition 14 controls over any conflicting requirements regarding the proof-of-loss deadline.

Third, the same Tenth Circuit decision also noted the district court's finding that "the underlying purpose of [Condition 14] is to protect the insurer from the additional risk of claims where receivers of a failed bank file a multitude of lawsuits to obtain additional funds to pour into the receivership."  *Id.* at 292.  This risk may arise regardless of whether General Agreement F had ever been invoked, further suggesting

---

[5] Unlike many contracts, the Bond contains no provision stating that its headings and labels are not to be considered when interpreting the agreement.

that Condition 14 should control even if General Agreement F had previously come into play.

Fourth, although parties generally may not discriminate against the FDIC's ability to recover on behalf of failed banks, Condition 14 falls under a notable statutory exception:

> The conservator or receiver may enforce any contract, *other than a director's or officer's liability insurance contract or a depository institution bond*, entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of or the exercise of rights or powers by a conservator or receiver.

12 U.S.C. § 1821(e)(13)(A) (emphasis added).  Such an unusual exception to the general rule suggests that provisions such as Condition 14 are of particular importance and should control over any conflicting provision.

The FDIC responds by noting that, by statute, it succeeds to all the rights of the bank it is taking over.  *See* 12 U.S.C. § 1821(d)(2)(A)(i) ("The [FDIC] shall, as conservator or receiver, and by operation of law, succeed to * * * all rights, titles, powers, and privileges of the insured depository institution . . . .").  But this does not necessarily mean that the FDIC has a vested right in General Agreement F.  Rather, the FDIC succeeds to the Bond and may enforce it according to its terms, bringing us back to the question of what those terms mean.  When General Agreement F and Condition 14 have both been triggered in the same course of events, which one controls?  The fact that the FDIC succeeds to all the rights of the Bank poses that question; it does not answer it.  For the reasons previously explained, the Court

18

concludes that the answer favors Condition 14 over General Agreement F.

The FDIC further contends, however, that a construction favoring Condition 14 is unreasonable.  (ECF No. 86 at 46–47 (citing *Gol TV, Inc. v. EchoStar Satellite Corp.*, 692 F.3d 1052, 1055 (10th Cir. 2012) ("[a]n interpretation which makes the contract or agreement fair and reasonable will be preferred to one which leads to a harsh or unreasonable result")).)  The FDIC points to the fact that, if KBS declines to defend the Bank under General Agreement F, then KBS obtains significant advantages:

> neither a judgment against the [Bank], nor a settlement of any legal proceeding by the [Bank], shall determine the existence, extent or amount of coverage under this bond for loss sustained by the [Bank], and [KBS] shall not be liable for any attorneys' fees, costs and expenses incurred by the [Bank].

(ECF No. 1-1 at 7.)  The FDIC argues that if Condition 14 applies even when General Agreement F has been invoked, then Condition 14 acts "to the detriment of the insured, yet simultaneously allows KBS to retain all the benefit it received from its General Agreement F election not to defend the underlying litigation."  (ECF No. 86 at 46 (emphasis removed).)

The Court is not persuaded that this result is inherently unreasonable.  General Agreement F and Condition 14 address different situations; the former applies before a bank has failed, and the latter applies after.  They are not necessarily connected (although they happen to be in this case), and neither one gives KBS an unbargained-for advantage.  The Court can conceive of a scenario where: (a) KBS's invocation of General Agreement F lulls a bank into thinking that it can delay its investigation of a potential claim, and (b) a receiver is appointed soon after, terminating

19

the Bond and wiping out the claim.  Perhaps in that circumstance, some form of

estoppel might prevent the Bank from relying on Condition 14.  But the FDIC does not

claim that the foregoing scenario occurred here, and in fact the record shows that KBS

specifically warned the Bank on April 2, 2009—eight days before the Bank failed—that

it needed to submit a complete proof of loss before any bank failure if it wished to

continue claiming coverage for that loss.  (*See* ECF No. 80-47 at 3–4.)  Thus, the Court

rejects the FDIC's argument that it is unreasonable to interpret Condition 14 as superior

to General Agreement F.

     3.   <u>Public Policy</u>

     Finally, the FDIC claims that the foregoing interpretation of Condition 14 "would

violate the public policy reflected in federal and state law and would be unenforceable."

(ECF No. 86 at 48.)  The FDIC cites no specific federal or state law expressing such a

public policy.  To the contrary, as already discussed, federal law specifically permits

provisions like Condition 14 to exist alongside the FDIC's otherwise broad powers to

remove impediments to its ability to recover on behalf of failed banks.  *See* 12 U.S.C.

§ 1821(e)(13)(A).

     Colorado law likewise upholds Condition 14:

> The general assembly hereby finds, determines, and
> declares that the following is enforceable and in conformity
> with the public policy of this state . . . : * * * Any fidelity bond,
> financial institution bond, or depository institution bond in
> effect or issued on or after April 30, 1993, that provides for
> termination of such bond upon the taking over of the bank by
> a receiver or other liquidator or by state or federal officials.

Colo. Rev. Stat. § 11-103-601(4)(a)(II).  Accordingly, Condition 14 does not violate

public policy.

In sum, the Court concludes that the claim the FDIC is attempting to enforce under the Bond was extinguished when the Bank failed to file a complete proof of loss before the FDIC's takeover on April 10, 2009.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Defendant's Motion for Summary Judgment (ECF No. 81) is GRANTED;

2.     The jury trial set to begin January 25, 2016 is VACATED;

3.     The Clerk shall enter final judgment in favor of Defendant Kansas Bankers Surety Company and against Plaintiff Federal Deposit Insurance Corporation as receiver of New Frontier Bank, Greeley, Colorado; and

4.     The Clerk SHALL TERMINATE this case.  Defendant shall have its costs.

Dated this 21st day of May, 2015.

BY THE COURT:

_____

William J. Martinez
United States District Judge